IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

**TIMOTHY SIMS,**

        **Plaintiff,**

**v.**                                                                    **CIVIL ACTION NO.: 3:20-CV-161
(GROH)**

**UNITED STATES OF AMERICA,
A. WILSON,
EDDIE ANDERSON,
INTEGRATED MEDICAL SYSTEMS, LLC,**

        **Defendants.**

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

On August 31, 2020, the *pro se* Plaintiff, who is a federal prisoner incarcerated at Gilmer FCI, in Glenville, West Virginia, initiated this case by filing a complaint with the Clerk, pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). ECF No. 1.[1]  On the same date Plaintiff filed a separate complaint pursuant to the Federal Tort Claims Act (FTCA) , 28 U.S.C. § 2671, in case number 3:20-CV-162.  Plaintiff was notified by the Court twice, on September 2, 2020, and on November 8, 2021, of the potential consequences of pursuing both a Federal Tort Claims Act and Bivens complaint simultaneously.  ECF Nos. 4, 25.  Plaintiff

---

[1]  All CM/ECF numbers cited herein are from the instant case, 3:20-CV-161, unless otherwise noted.

responded on November 29, 2021[2], and elected to continue to proceed both actions. ECF No. 31.  On March 10, 2022, Plaintiff filed a motion to consolidate the two cases. 3:20-CV-161, ECF No. 43 and 3:20-CV-162, ECF No. 35.  The two actions were consolidated by order entered March 15, 2022, with 3:20-CV-161 being designated as the lead case.  ECF No. 45.

On the same date Plaintiff filed his motion to consolidate [ECF No. 43; 3:20-CV-162, ECF No. 35], he filed as attachments, a memorandum, amended FTCA complaint, an amended Bivens complaint, and a generic complaint form.  3:20-CV-162, ECF Nos. 35-1, 35-3, 35-4, 35-5.  However, on each document, only case number, "3:20-CV-162", was provided.   See ECF No. 49 at 2.  On May 4, 2022, the Court entered an order which directed the Clerk to refile all three amended complaints in the lead case.  ECF No. 49. On that same date, the complaints were refiled as: (1) an amended FTCA complaint against the United States of America [ECF No. 50]; (2) an amended Bivens complaint against A. Wilson ("Wilson", and Eddie Anderson ("Anderson") [ECF No. 51]; and (3) an amended complaint against Integrated Medical Systems, LLC ("IMS") [ECF No. 52]. Because the Court's May 4, 2022, order did not address the memorandum [3:20-CV-162, ECF No. 35-1], it was not filed in the lead case.  However, the memorandum has been considered by the Court, and is attached to this Report and Recommendation as Court's Exhibit 1.

Plaintiff claims he is entitled to damages under both <u>Bivens</u> and the Federal Tort Claims Act for acts which allegedly occurred at Gilmer FCI in the Northern District of West Virginia.  The matter is now before the undersigned for a Report and Recommendation

---

[2]  The "Notification by Plaintiff" was filed with the Clerk on November 29, 2021, but executed by Plaintiff on November 19, 2021.  ECF No. 31.

to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR PL P 2.  For the reasons set forth below, the undersigned recommends that the FTCA complaint should proceed, but the Bivens complaint be denied and dismissed without prejudice based on failure to exhaust.

## II.   FACTUAL AND PROCEDURAL HISTORY

Plaintiff's claims in his Bivens and FTCA complaints are predicated on his assertions that on March 17, 2018, while playing basketball at FCI Gilmer he ruptured his right Achilles tendon, and despite promptly reporting his injury to the medical services department, he received untimely and inadequate medical treatment.

### A.   Claims in the FTCA Complaint

Plaintiff's amended FTCA complaint asserts a sole claim for relief, that the Defendants[3] violated their duty of care pursuant to 18 U.S.C. §§ 4001, 4042, and the regulations established by the BOP which caused harm to Plaintiff.  ECF No. 50 at 6. Plaintiff claims that as a result of the delay in his medical care he suffered "extensive pain and suffering" and permanent limited mobility and gait problems.  Id. at 8.  In his memorandum, Plaintiff contends that his injury was exacerbated by the repeated actions of Wilson, a certified physician's assistant (PA-C) and Anderson, a doctor of osteopathy (DO), in delaying his care.  Plaintiff contends that:

1.      On an unspecified date two weeks after his injury he was seen by an orthopedist, Dr. Joseph Snead, who diagnosed a serious rupture of the Achilles

---

[3]  Although the Court-approved form states that the only defendant in a Federal Tort Claims Act suit, is the United States of America, Plaintiff asserts that plural "Defendants" acted, and identifies Alicia Wilson and Eddie Anderson as the federal employees whose actions form a basis for his claim.  ECF No. 50 at 6.

tendon, and "advised surgical repair was required immediately", which treatment notes were reviewed by both Wilson and Anderson [Court's Exhibit 1 at 1];

2.      On April 6, 2018, Anderson approved Plaintiff's surgery and identified the target date as April 9, 2018 [Id.];

3.      More than a month later, Plaintiff sent Wilson an email inquiry about his surgery date, and that Wilson confirmed Plaintiff's surgery was approved [Id.];

4.      Wilson and Anderson reviewed the treatment notes of another orthopedist, Dr. Robert Santrock, who examined Plaintiff on May 3, 2018, and documented that Plaintiff had a chronic Achilles tendon rupture, stated Plaintiff is "going to have a complex postoperative course", and ordered an MRI prior to surgery [Id.];

5.      On June 20, 2018, Plaintiff emailed Wilson about the harm caused by delay in surgery, which email Anderson reviewed [Id.];

6.      In a July 20, 2018, email to Wilson, which was copied to Anderson, Plaintiff expressed concerns about surgical delay [Id.];

7.      Plaintiff was transported to Snead's office in August 2018, with the understanding his surgery would be performed, however, the appointment was for another doctor who was not available, and that Wilson and Anderson were aware of the error [Id.];

8.      Plaintiff emailed Wilson and copied Anderson in September 2018, again expressing his concerns about the surgical delay [Id.];

9.      On September 25, 2018, Plaintiff was again treated by Dr. Santrock who now advised that "they took too long to bring you back. . . scar tissue has formed over the Achilles. . . I would be doing you a disservice if I put you under the knife."

4

[Id.];

10.     Because Wilson and Anderson failed to adhere to BOP Program Statement 6031.04, Plaintiff was not transferred to a BOP medical center where he would have received more physical therapy [Id. at 2];

11.     The failure of Integrated Medical Systems (IMS) to perform its duties caused the delay in Plaintiff's surgery [Id.];

12.     Anderson, Wilson, and IMS denied Plaintiff the medical care prescribed by his physician [Id.];

13.     Although Anderson and Wilson knew Plaintiff required surgery, they opted for "an easier and less efficacious treatment" [Id.];

14.     Anderson and Wilson recklessly disregarded the substantial risk that surgical delay would cause permanent harm to Plaintiff [Id.]; and

15.     IMS failed to fulfill their duty to BOP and to Plaintiff, causing him harm [Id.].

As damages, Plaintiff seeks an unspecified amount of compensatory damages, and a declaratory judgment that Wilson and Anderson were negligent.  Id.

**B.     Claims in the Bivens Complaint**

The Bivens complaint also alleges a sole claim for relief, that Wilson and Anderson were deliberately indifferent to Plaintiff's need for medical treatment, which treatment was significantly delayed.  ECF No. 51 at 7.  Plaintiff contends that neither Wilson nor Anderson "timely addressed his complaints of pain and gait impairment."  Id.  Further, Plaintiff contends that Wilson and Anderson "failed to ensure his injury and treatment were timely provided for."  Id. at 8.  Plaintiff relies upon the same memorandum [Court's Exhibit 1] to support his Bivens complaint, but further argues that his initial treating physician, Dr.

Snead "advised surgical repair was required immediately." Id. at 1.

Plaintiff asserts he experienced "tremendous pain and suffering over a prolonged period" and now has limited mobility and permanent gait impairment. Id. at 9. As damages, Plaintiff seeks an unspecified amount of compensatory damages, a declaratory judgment that Wilson and Anderson were negligent and violated Plaintiff's Eighth Amendment rights, and to enjoin the further violation of Plaintiff's rights. Id. at 9.

### C. Claims in the Complaint Against Integrated Medical Systems

Plaintiff asserts that IMS failed to provide for his medical needs, as contracted by the Bureau of Prisons, when it failed to timely schedule treatment and medical appointments. ECF No. 52 at 6. Plaintiff again relies upon his memorandum [Court's Exhibit 1] to support his complaint against IMS. Id. Plaintiff contends that he suffered a permanent lack of mobility and gait impairment. Id. at 7. He seeks an unspecified amount of compensatory relief, and a judgment and order "declaring Defendant's conduct was negligent." Id. at 8.

### D. Motion to Dismiss or for Summary Judgment Filed by United States and Wilson

On June 2, 2022, Defendants United States of America and A. Wilson filed a motion to dismiss or for summary judgment, accompanied by two separate memoranda in support thereof. ECF Nos. 54, 55, 56. Defendants filed an amended motion to dismiss or for summary judgment on June 10, 2022, which corrected typographical errors in the first motion. ECF No. 60. Additionally, Defendants filed exhibits in support of each memorandum. ECF Nos. 55-1 through 55-6, 56-1 through 56-6.[4]

---

[4] Exhibits ECF Nos. 55-1 through 55-6 and ECF Nos. 56-1 through 56-6 contain many of the same documents, but are not identical.

Medical records[5] and correspondence submitted as exhibits by Defendants include the following notations regarding Plaintiff's treatment related to his Achilles injury:

1.    On March 17, 2018, at 6:15 p.m., Plaintiff reported to Health Services at Gilmer and was seen by Jessica Houchin ("Houchin"), EMTP (Emergency Medical Technician Paramedic).  ECF No. 55-3 at 23 – 24. Plaintiff reported a sports injury to his right ankle with pain and swelling which occurred less than 30 minutes previously, and that he was unable to bear weight on his right ankle.  Id.  Plaintiff was given crutches and directed to return on Monday for an x-ray.  Id.

2.    On March 19, 2018, at 12:56 p.m., Plaintiff returned to Health Services and was again seen by Houchin for the recommended follow up x-ray of his right ankle for a "suspected sprain vs tear of the ligaments of the right ankle." Id. at 20 – 21.   Houchin's notes state that Plaintiff was injured while playing basketball, when he "heard a 'pop' and went to the floor."  Id.  Houchin observed swelling of the right foot, from the tarsals through the ankle and ascending up the calf.  Id.  The record was co-signed by Wilson on March 19, 2018, at 3:14 p.m.  Id. at 22.

3.    On March 19, 2018, at 12:56 p.m., Farhad Khorashadi, MD, of Statrad Leading Teleradiology, documented his review of right ankle film for Plaintiff.  ECF No. 55-3 at 104 – 105.  An Achilles rupture was not noted.  Id.

4.    On April 3, 2018, Joseph Snead, MD, of Weston Orthopedics and Sports Medicine, examined Plaintiff.  Id. at 98 – 99.  Dr. Snead assessed Plaintiff

---

[5] A number of medical records submitted by Defendants concern substantial dental work performed upon Plaintiff in the days before his Achilles injury.  The dental records appear to be unrelated to Plaintiff's complaint related to his Achilles injury, except that the dental treatment and follow up occurred in close proximity to the Achilles injury.

with a "rupture of Achilles tendon, will refer to WVU for follow up.  Since injury is 2 weeks old, may be difficult to repair and need a graft or reconstructive procedure.  In meantime, placed in [Controlled Ankle Motion] CAM" boot.  Id. at 98.  The record was electronically signed and verified by Dr. Snead on April 3, 2018, at 4:58 p.m.  Id. at 99.

5.      On April 3, 2018, at Health Services, Houchin documented that Plaintiff had a surgical consult for Achilles tendon rupture.  ECF No. 55-3 at 18 – 19.  Plaintiff was given a walking boot and advised he would be scheduled for surgical repair.  Id.  The record was reviewed by Wilson on April 4, 2018, at 9:05 a.m.  Id. at 19.

6.      On April 6, 2018, at 12:10 p.m., at Health Services, Anderson documented that Plaintiff had a consultation for orthopedic surgery for Achilles tendon repair, with an "urgent" "scheduled target date" of April 9, 2018.  ECF No. 55-3 at 17.

7.      On April 22, 2018, at 9:20 p.m., Plaintiff sent an email to Wilson asking if he was "approved to this surgery that Doctor Snead said I needed?  If not how long does something like this take?  I also have a few questions to my condition that if it do[es] take long will it [cause] the injury to become even worse than what it is?" ECF No. 55-3 at 97.  Wilson replied that Plaintiff was approved for the surgery, but that she was unsure of the timing.  Id.

8.      On May 3, 2018, Plaintiff was examined by orthopedic surgeon Robert Santrock, MD, an Associate Professor in the WVU Department of Orthopaedics.  Id. at 88.  Dr. Santrock's noted that Plaintiff, "reported no treatment

other than a boot walker."  Id.  Further, Dr. Santrock's treatment plan stated, "The patient is going to have a  complex postoperative course and will need surgery planning to include an MRI to gauge what I need… . Therefore, the MRI is going to be helpful.  The order has been placed.  A separate surgical plan has been performed as well."  Id. at 89.  The surgical plan prepared by Dr. Santrock states:

> There will be a right Achilles tendon debridement [and] repair for rupture in the mid substance. . . . An MRI needs to be completed prior to my surgery for my review and planning of surgery.  This MRI needs to be of the right ankle and has been ordered, and the requisition has been handed to the prison guards at his appointment.
>
> This will be an outpatient procedure, 1.5 hours, general anesthesia. . . .
>
> Postoperatively, the patient will be on crutches, nonweightbearing for the first 3 weeks, followed up by 3 weeks in an equinus position case.  Then we will convert him to a boot walker, removing 3 heel wedges and doing physical therapy. I imagine this will be difficult in the prison setting, but he needs to have some therapy postoperatively.

Id. at 90.

9.      On May 3, 2018, Dr. Santrock also electronically signed an order for an MRI of Plaintiff's right ankle without contrast.  Id. at 93 – 94.  The order contains a notation that the patient does not agree to have the MRI/Pet scan performed at WVUH/UHA.  Id. at 93.

10.     On May 3, 2018, at 11:25 a.m., at Health Services, registered nurse Bridgett Strawser ("Strawser") prepared a "medical trip return encounter" notation. Strawser documented that, "Per inmate and escorting staff, outside provider recommended surgical repair of right Achilles tendon.  Needs a[n] MRI of right ankle first."  ECF No. 55-3 at 14.  Anderson co-signed the records on May 3, 2018, at

9

11:50 a.m.  Id. at 16.

11.     On June 20, 2018, at 8:25 p.m., Plaintiff sent an email to Wilson about the scheduling of his MRI and Achilles surgery.  Id. at 81.  Plaintiff wrote:

> I was told by the doctor in Morgantown that he wanted his own MRI to do my [Achilles] tendon surgery.  This has been a couple of months ago. I know you can't tell me when it is scheduled but can you [at] least tell me that somebody has this in the making?  I'm very concerned about the matter because I want to get on with the surgery and start my rehab soon as possible.  I was already approved for surgery with the first doctor and it fell through and no one can give me an explanation.

Id.  Wilson's full response read, "Yes, it is scheduled soon."  Id.

12.     On June 26, 2018, Plaintiff was given an MRI by Premier Imaging in Charleston, West Virginia.  Id. at 82.  Radiologist Joseph Skeens, MD, wrote that "the findings most likely represent a chronic partial tear of the Achilles tendon Grade 1 with no evidence of complete disruption."  Id.

13.     On July 20, 2018, at 9:58 a.m., Plaintiff emailed Wilson about his treatment, acknowledging his incarcerated status, but requesting a course of treatment.  Id. at 79.  Plaintiff posed two questions: (1) if he was not going to be scheduled for surgery soon, whether he could be given alternatives to strengthen his tendon, and (2) if he did get the surgery, whether there he would be able to see a therapist to give Plaintiff the exercises he could perform himself.  Id.

14.     On August 20, 2018, at 9:14 a.m., at Health Services, Jon Bremar, EMTP, documented that Plaintiff was transported to an outside medical provider for treatment, but that Plaintiff "was not seen at this time was advised that it was supposed to be rescheduled and was not."  ECF No. 55-3 at 13.

15.     On September 25, 2018, Plaintiff was seen by Dr. Santrock and a resident Taylor Shackleford, MD,[6] for a follow up appointment for an "acute rupture" of his Achilles tendon.  Id. at 70 – 73.  Dr. Santrock documented that Plaintiff was seen five months ago and was returning with his MRI.  Id. at 70.  Further Dr. Santrock noted that since his last appointment, Plaintiff was "able to transition to a normal shoe. . . [but] has not been able to do much activity outside of walking."  Id. Further, Dr. Santrock documented that Plaintiff stated that "walking does hurt and stairs are especially painful, but he is motivated to get back to doing normal activities and being able to exercise more."  Id.  Additionally, in his assessment and plan for treatment, Dr. Santrock noted that Plaintiff's:

> Achilles tendon has scarred in and there is no obvious gap anymore.  We discussed with him that the only surgical option would be a debridement that could help with pain but would not help with strengthening and likely the pain would resolve over months to years.  Strengthening he would have to do on his own.  Would worry that if we did do surgery that he would not receive adequate physical therapy postoperatively at the prison.

ECF No. 55-3 at 70.

16.     Also on September 25, 2018, Jessica Houchin, EMTP, documented the outside medical trip for Health Services.  Id. at 11.  On September 26, 2018, Wilson cosigned the outside medical encounter record generated the day before. Id. at 12.

17.     Also on September 26, 2018, Wilson created a separate Chart

---

[6]  The medical records are signed by both Drs. Shackleford and Santrock, and Dr. Santrock noted that he "saw and examined the patient," and "directly supervised the resident's activities and procedures," "reviewed the resident's note," and "agree[d] with the findings and plan of care as documented in the resident's note."  ECF No. 55-3 at 71.

Review encounter note, which recommended physical therapy with a target date of November 25, 2018.[7] Id. at 10.

18.    On October 3, 2018, Erika Myers, MPT, ("Myers") performed a physical therapy evaluation at Health Services.  ECF 55-3 at 7.  Myers incorrectly documented that Plaintiff's **left** Achilles tendon ruptured.  Id.  Further, Myers documented that Plaintiff reported a pain scale of 5/10, that he reported "difficulty with completion of any prolonged walking, ascending stairs and lack of [Range of Movement] and generalized strength."  Id.  That record was reviewed by Anderson on October 5, 2018, at 8:47 a.m. Id. at 9.

19.    On October 17, 2018, Myers documented a physical therapy follow up visit where Plaintiff did not report any pain, and where Myers performed Achilles tendon kinesio taping.  Id. at 5.  That record was reviewed by Anderson on October 19, 2018, at 1:42 p.m. Id. at 6.

20.    On October 31, 2018, Myers documented a physical therapy follow up visit where Plaintiff reported aching pain on a scale of 4/10.  Id. at 2.  Further, Plaintiff stated that he "continue[d] to have some foot and ankle pain and continues to have weakness of his [right] leg in general, but he no longer limps unless it's a 'bad day'."  Id.  Myers assessed Plaintiff's progress, including that "he continues to lack full gastroc activation as indicated by his difficulty with gastroc raises."[8]

---

[7] It is unclear from this record whether the target date was intended to be the first or final physical therapy date, however, further records demonstrate that Plaintiff received physical therapy starting on October 3, 2018.

[8] The gastrocnemius muscle is the largest muscle in the lower leg, in the posterior of the calf. https://www.britannica.com/science/gastrocnemius-muscle.  The muscle flexes the knee and foot and runs from the Achilles tendon at the heel to the patella (kneecap) and femur (thighbone).  Action of the gastrocnemius pulls the heel up and thus extends the foot downward; the muscle provides the propelling force in running and jumping.  Gastroc raises are heel-raising and -lowering exercises which are typically suggested for Achilles tendon rehabilitation. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5343533/.

Anderson reviewed this record on November 2, 2018.  ECF No. 55-3 at 4.

21.     On November 28, 2018, Myers, saw Plaintiff for a physical therapy follow up visit.  Id. at 109.  The clinical encounter notes document that Plaintiff reported "that he can tell that he continues to improve with his strength and dynamic balance; however, he can tell that his RLE [Right Leg Extremity] is still much weaker compared to the LLE [Lower Leg Extremity]."  Id.  Anderson reviewed the clinical encounter note on December 12, 2018, at 1:19 p.m.  Id. at 111.

Further records submitted by Defendants relate to Plaintiff's submission of administrative remedies.  The declaration of Destiny Spearen, a paralegal for the Beckley Consolidated Legal Center at FCI Beckley, states that:

1.     On January 24, 2020, Plaintiff filed an administrative tort claim with the BOP alleging negligence on the part of FCI Gilmer Health Services related to his treatment for an injury to his ankle sustained while Plaintiff was playing basketball in March 2018.  ECF No. 55-4 at 2.

2.     The BOP denied Plaintiff's claim by letter dated July 13, 2020, which concluded that "Plaintiff had received continuous and adequate medical care in relation to his *wrist* injury."  Id.  (Emphasis added).

3.     The "Claim for Damage, Injury, or Death" form, Standard Form (SF) 95, was signed by Plaintiff on January 8, 2020, and stamped received by the Mid-Atlantic Regional Office on January 17, 2020, and received by the Beckley Consolidated Legal Center on January 24, 2020.  ECF No. 55-5 at 2.  The attached two typewritten pages summarize Plaintiff's claims related to his ruptured Achilles tendon, and his alleged denial of medical care.  Id. at 3 – 4.

13

4.      A letter dated July 13, 2020, from the Beckley Consolidated Legal Center denied Plaintiff's tort claim TRT-MXR-2020-02548.  ECF No. 55-6.  The letter advised Plaintiff that if he was not satisfied with the decision he had "six months from the date of mailing of this letter to bring suit in an appropriate United States District Court."  Id.

Plaintiff initiated the instant action on August 31, 2020.  ECF No. 1.

### 1.      Arguments of the United States of America

The United States argues that Plaintiff's FTCA claim should be dismissed because: (1) the Independent Contractor Exception to the FTCA denies this Court subject matter jurisdiction [ECF No. 55 at 8 - 12]; (2) Plaintiff failed to sufficiently allege that the United States or its agents caused any delay in medical treatment or that the delay proximately caused his injury [Id. at 13 – 14].

### 2.      Arguments of Defendant Wilson[9]

In her memorandum in support of the motion to dismiss, Wilson argues that the Plaintiff is not entitled to relief because: (1) Plaintiff failed to exhaust his Bivens claims prior to filing suit [ECF No. 56 at 9 – 12]; (2) Plaintiff's official capacity claims against a federal employee are not cognizable under Bivens [Id. at 12]; (3) Plaintiff's amended complaint does not comport with Federal Rule of Civil Procedure 8 because the claims asserted are "vague, conclusory, and do not state sufficient detail regarding PA Wilson's acts and/or omissions" [Id. at 12 – 13]; (4) Plaintiff fails to demonstrate that Wilson acted with deliberate indifference to his serious medical needs [Id. at 13 – 17]; (5) Plaintiff's Bivens

---

[9]  The Court notes that the memorandum of law in support of the motion to dismiss was filed on June 2, 2022, solely on behalf of A. Wilson, but also asserts an argument as to Anderson, regarding his lack of service.  ECF No. 56.  Anderson later filed a separate motion to dismiss which relied upon the arguments made in the memorandum of law previously filed by Wilson.  ECF No. 71.

14

claims are subject to the FTCA's judgment bar if the FTCA claims are dismissed [Id. at 18]; (6) Wilson is protected by the qualified immunity doctrine [Id. at 18 – 19]; and (7) Plaintiff's claims against Anderson must be dismissed because he was never served with process [Id. at 20].

**E.      Plaintiff's Response to Motion to Dismiss of United States and Wilson**

On July 8, 2022, Plaintiff filed a Response to Defendants' motion to dismiss, along with an exhibit.  ECF Nos. 67, 67-1.  Therein, Plaintiff argues that he sued the Defendants for ordinary negligence, not medical negligence.  ECF No. 67 at 1.  Plaintiff asserts that the core of his claims is the failure of Defendants to ensure he was timely transported to off-site diagnostic and surgical consults for his torn Achilles tendon.  Id.  Plaintiff argues that regardless of the BOP's contract with IMS, Defendants still owed a duty of care to provide him with medical care.  Sims asserts that, "Fatal to their defense is the admission by the BOP that 'it monitors wait times for outside medical appointments through the consultation queue...Health Services Administrators review this consultation queue frequently and specifically'.  See Audit of the BOP Comprehensive Medical Services Contracts at 32, March 2022."      https://oig.justice.gov/sites/default/files/reports/22-052.pdf.

In further support of his claims, Plaintiff cites to a district court case from the Eastern District of North Carolina, Knowles v. United States, No. 5:12-CT-3212-F, 2015 WL 13214314 (E.D.N.C. December 14, 2015).  ECF No. 67 at 2.  Plaintiff contends that the Knowles court found that while the BOP contracted with the independent contractor vendor to schedule all offsite medical care, the responsibility to ensure that inmates were actually transported to scheduled appointments remained with the BOP.  Id.  Plaintiff also argues

that <u>West v. Adkins</u>, 487 U.S. 42, 56 (1988), prohibits BOP medical staff from evading culpability for inadequate medical care to inmates.  ECF No. 67 at 6.

Plaintiff further argues that he exhausted his administrative remedies, contending that he filed administrative remedies with the institutional, regional, and central offices all about his Achilles tendon.  Plaintiff asserts that the warden failed to timely respond to his BP-9 filing at the facility, and that pursuant to 28 CFR 542.18, "the inmate may consider the absence of a [timely] response to be a denial at that level".  <u>Id.</u> at 3.  Thereafter, Plaintiff filed a BP-10 concerning his Achilles injury with the Mid-Atlantic Regional office, which rejected the remedy for not filing a BP-9.  <u>Id.</u>  Plaintiff then filed a BP-11 with the Central office which was subsequently denied.  <u>Id.</u>

Plaintiff further contends that his claims are not presented under <u>Bivens</u>, and that he is not seeking monetary damages from any of the government defendants for constitutional violations, but is seeking declaratory and injunctive relief against Wilson and Anderson in their official capacities.  <u>Id.</u>  Plaintiff contends that, "[t]he notorious Bivens is only referred to in this action because the Court forces inmates to use Bivens Action Forms when presenting a civil rights claim."  <u>Id.</u> at 4.

Plaintiff also argues that summary judgment is inappropriate because there are outstanding discovery issues related to the BOP's contract with IMS.  <u>Id.</u> at 4 – 5.  Plaintiff further disputes facts asserted by Defendants, and argues that: (1) he was not referred to another provider, rather Dr. Snead was unavailable and there were no other capable surgeons available; (2) Dr. Santrock recommended an MRI on the date he examined Plaintiff, but the BOP would not approve the imaging; (3) Plaintiff's transport to one medical appointment was erroneously made to a provider based on erroneous scheduling; (4) Dr.

Santrock later advised Plaintiff that scar tissue had grown over his injury, "not that it had 'stabilized'"; (5) Plaintiff's physical therapy did not conform to BOP policies; and (6) PA Wilson is a medical provider at FCI Gilmer.  ECF No. 67 at 2 – 3.

Finally, Plaintiff argues that qualified immunity should not be used to shield Wilson and Anderson from liability for the months-long delay in providing Plaintiff treatment.  Id. at 7.

### F.    Defendants' Reply to Plaintiff's Response

On July 21, 2022, Defendants filed a reply which argued: (1) that the OIG report[10] cited by Plaintiff does not establish a standard of care, which is instead established by testimony of a qualified expert witness [ECF No. 69 at 1 – 2]; (2) Plaintiff falsely claimed that he exhausted his administrative remedy process as to his Bivens claims [ECF No. 69 at 2 – 3]; and (3) the independent contractor exception denies the Court subject matter jurisdiction over Plaintiff's FTCA claims [ECF No. 69 at 3 – 4].

### G.    Motion to Dismiss of Eddie Anderson

Defendant Eddie Anderson filed a motion to dismiss or in the alternative for summary judgment on August 4, 2022.  ECF No. 71.  Therein Anderson argues that the Bivens claims against him should be dismissed because:

> (1) the Plaintiff failed to exhaust his administrative remedies prior to filing this civil action; (2) Plaintiff's claims against a federal employee in his or her capacity are barred; (3) Plaintiff's Complaint does not comport with the pleading requirements of Fed. R. Civ. P. 8; (4) Plaintiff cannot demonstrate that Dr. Anderson acted with deliberate indifference to a serious medical need; (5) the Judgment Bar should apply, if applicable; and (6) Dr. Anderson is entitled to the affirmative defense of qualified immunity.

---

[10]    Defendants further argue that the OIG Report specifically concerns comprehensive medical services provided at Federal Correctional Complex located in Butner, North Carolina (FCC Butner); Federal Medical Center located in Devens, Massachusetts (FMC Devens) and Federal Correctional Institution located in Ray Brook, New York (FCI Ray Brook).  ECF No. 69 at 1 – 2.

ECF No. 71 at 1.  Anderson relies on the arguments made in Wilson's memorandum of law in support of her motion to dismiss.  Id. at 1 – 2.

### H.    Plaintiff's response to Anderson's Motion to Dismiss

On August 25, 2022, Plaintiff filed a response which relied upon the arguments previously asserted in his response to Wilson's motion.  ECF No. 81.

### III.    LEGAL STANDARD

### A.    Review of Complaints

Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and the Court's Local Rules of Prisoner Litigation Procedure, this Court is authorized to review such complaint and submit findings and recommendations to the District Court. This Court is charged with screening Plaintiff's case to determine "any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, . . . to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action."

### B.    Pro Se Litigants.

Courts must read *pro se* allegations in a liberal fashion.  Haines v. Kerner, 404 U.S. 519, 520 (1972).  However, a complaint is frivolous if it is without arguable merit either in law or in fact.  Neitzke v. Williams, 490 U.S. 319, 325 (1989) (superseded by statute).  The Supreme Court in Neitzke recognized that:

> Section 1915(d)[11] is designed largely to discourage the filing of, and waste of judicial and private resources upon,

---

[11] The version of 28 U.S.C. § 1915(d) which was effective when Neitzke was decided provided, "The court may request an attorney to represent any such person unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious." As of April 26, 1996, the statute was revised and 28 U.S.C. § 1915A(b) now provides, "On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint-- (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."

> baseless lawsuits that paying litigants generally do not
> initiate because of the costs of bringing suit and because
> of the threat of sanctions for bringing vexatious suits under
> Federal Rule of Civil Procedure 11. To this end, the
> statute accords judges not only the authority to dismiss
> a claim based on an indisputably meritless legal theory,
> but also the unusual power to pierce the veil of the
> complaint's factual allegations and dismiss those claims
> whose factual contentions are clearly baseless.
> Examples of the former class are claims against which it
> is clear that the defendants are immune from suit. . .

490 U.S. at 327.

### C.    Actions Under the Federal Tort Claims Act (FTCA)

The FTCA is a comprehensive legislative scheme by which the United States has

waived its sovereign immunity to allow civil suits for actions arising out of the negligent

acts of agents of the United States.  The United States cannot be sued in a tort action

unless Congress has waived the government's sovereign immunity and authorized suit

under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of

the FTCA are found in Title 28 of the United States Code. 28 U.S.C. §§ 1346(b), 1402(b),

2401(b) and 2671-2680.

In 2021, the Supreme Court issued a decision which summarized the historical

precedent which led to the enactment of the FTCA:

> The FTCA streamlined litigation for parties injured by federal
> employees acting within the scope of their employment.
> Before 1946, a plaintiff could sue a federal employee directly
> for damages, but sovereign immunity barred suits against the
> United States, even if a similarly situated private employer
> would be liable under principles of vicarious liability. Despite
> that immunity, the Government often would provide counsel
> to defendant employees or indemnify them.  In addition,
> Congress passed private bills that awarded compensation to
> persons injured by Government employees.  But by the
> 1940s, Congress was considering hundreds of such private

bills each year.   Critics worried about the speed and fairness with which Congress disposed of these claims.

In 1946, Congress passed the FTCA, which waived the sovereign immunity of the United States for certain torts committed by federal employees acting within the scope of their employment.  The Act in effect ended the private bill system by transferring most tort claims to the federal courts. Plaintiffs were (and are) required to bring claims under the FTCA in federal district court. Federal courts have jurisdiction over these claims if they are actionable under § 1346(b).  A claim is actionable if it alleges the six elements of § 1346(b), which are that the claim be:

 [1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.[12]

Brownback v. King, 141 S. Ct. 740, 746 (2021) (cleaned up and internal citations omitted).

An inmate "can sue under the FTCA to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150 (1963). The FTCA provides at § 2674 as follows:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

---

[12]  28 U.S.C. § 1346(b)(1) provides, "[T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

However, the FTCA does not create a new cause of action. <u>Medina v. United States</u>, 259 F.3d 220, 223 (4th Cir. 2001). "The statute merely "permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." <u>Id.</u>

Even where the government has waived sovereign immunity, the FTCA only authorizes lawsuits against the United States itself. 28 U.S.C. § 1346(b). Therefore, the United States, not any government employee or agency is the only proper defendant in an FTCA lawsuit. <u>See</u> 28U.S.C. 2679(a); <u>Webb v. Hamidullah</u>, 281 F. App'x 159, 161 n. 4 (4th Cir. 2008) (per curiam) (unpublished) (United States is the only proper defendant in FTCA claim); <u>Holmes v. Eddy</u>, 341 F.2d 477, 480 (4th Cir. 1965) (per curiam) (federal agency cannot be sued pursuant to the FTCA); <u>Allfgeir v. U.S.</u>, 909 F.2d 869 (6th Cir. 1990) ("The FTCA clearly provides that the United States is the only proper defendant in a suit alleging negligence by a federal employee").

A constitutional civil rights claim is not cognizable in an FTCA lawsuit. <u>FDIC v. Myer</u>, 510 U.S. 471, 477-79 (noting that a constitutional tort claim is not cognizable in an FTCA lawsuit because the United States has not waived its sovereign immunity with respect to constitutional tort allegations); <u>Blanchard v. United States</u>, No. 2:14cv58, 2015 WL 4107311, at 13 (N.D.W. Va. July 7, 2015), <u>aff'd</u> 622 F. App'x 287 (4th Cir. 2015) (per curiam) (unpublished) (finding that a civil rights claim alleging a violation of the Eighth Amendment prohibition against cruel and unusual punishment is not actionable against the United States in an FTCA lawsuit because a constitutional tort claim is not cognizable under the FTCA.

A number of statutory exceptions apply to the Federal Tort Claims Act, including

an exception for any discretionary function, or for any damages related to establishment of a quarantine:

> The provisions of this chapter and section 1346(b) of this title shall not apply to--
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
>
> . . . .
>
> (f) Any claim for damages caused by the imposition or establishment of a quarantine by the United States.

28 .S.C.A. § 2680.

### D.     Eighth Amendment Right Against Cruel and Unusual Punishment

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981), and Helling v. McKinney, 509 U.S. 25, at 31, 113 S.Ct. 2475, at 2480 (1993)).  As recognized by the Supreme Court, a denial of medical care to an inmate may constitute a violation of the Eighth Amendment.  "The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and

must 'take reasonable measures to guarantee the safety of the inmates.'"  <u>Farmer</u>, 511 U.S. at 832, 114 S. Ct. at 1976.

Prior to the Supreme Court's holding in <u>Farmer</u>, the Court recognized that, "[o]ur conclusion in *Estelle v. Gamble,* [ ] that deliberate indifference to an inmate's medical needs is cruel and unusual punishment rested on the fact, recognized by the common law and state legislatures, that 'an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.'"  <u>Rhodes v. Chapman</u>, 452 U.S. at 347, 101 S. Ct. at 2399, quoting <u>Estelle v. Gamble</u>, 429 U.S., at 103, 97 S.Ct., at 290.   The <u>Rhodes</u> Court further explained, "[i]n *Estelle v. Gamble,* [ ] we held that the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose.  <u>Rhodes</u>, 452 U.S. at 347.  These principles apply to the conditions of confinement and require that the conditions within a prison comport with "contemporary standard[s] of decency" to provide inmates with "the minimal civilized measure of life's necessities."  <u>Id.</u>

### E.    Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a case when a complaint fails to state a claim upon which relief can be granted.  The Federal Rules of Civil Procedure require only, "'a short and plain statement of the claim  showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited, "the accepted rule that  a complaint should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46.

Plaintiff's complaint was filed *pro se* and therefore the Court must liberally construe his pleadings.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 - 1 (1972) (per curiam); Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197 (2007).  Although a complaint need not contain detailed factual allegations, a plaintiff's obligation in pleading, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face."  Id. at 555, 570.  In Twombly, the Supreme Court found that, "because the plaintiffs [ ] have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  Id. at 570.  Thus, to survive a motion to dismiss, a plaintiff must state a plausible claim in his complaint which is based on cognizable legal authority and includes more than conclusory or speculative factual allegations.

 "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," because courts are not bound to accept as true a legal conclusion couched as a factual allegation.  Id. at 678.  "[D]etermining whether a complaint states a plausible claim . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679.  Thus, a well-pleaded complaint  must offer more than, "a sheer possibility that a defendant has

acted unlawfully," in order to meet the plausibility standard and survive dismissal for failure to state a claim.  Id. at 678.

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly,  it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."  Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff.  Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

## F.  Motions for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In applying the standard for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion to, "demonstrate the absence of a genuine issue of material fact."  477 U.S. at 323.  Once "the moving party has carried its

burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a verdict." Anderson, supra, at 256. Thus, the nonmoving party must present specific facts showing the existence of a genuine issue for trial, meaning that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248.

To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, supra, at 248.

Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, supra, at 587. "Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. citing First Ntl. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 155, 1592 (1968). See Miller v. Fed. Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). Although any permissible inferences to be

drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Matsushita, supra, at 587-88. Anderson, supra, at 248-49.

## IV.     ANALYSIS

This case presents the question of whether the Bureau of Prisons can avoid liability for denying an inmate medical care by using contractors who fail to timely schedule emergency surgery which is prescribed by outside physicians.  Stated otherwise, is the BOP liable when an inmate's injury, which permanently impairs his ability to walk, is exacerbated because BOP employees refuse to ensure that outside contractors promptly schedule necessary and urgent medical appointments?

### A.     Plaintiff's FTCA Claim

Plaintiff asserts that he was injured when agents of the United States Bureau of Prisons negligently failed to: (1) provide him prompt and appropriate medical care; (2) ensure Plaintiff received medical treatment prescribed for him, including surgical repair and an MRI necessary for that surgery; and (3) ensure the prompt scheduling on his medical care.  Plaintiff identified Wilson and Anderson[13] as the wrongdoers who by their negligence proximately caused the exacerbation of his Achilles injury.  ECF No. 50, Court's Exhibit 1.

As recognized by the Supreme Court in Brownback v. King, 141 S. Ct. at 746, an FTCA claim is actionable if it alleges the six elements of 28 U.S.C. § 1346(b).

---

[13]   To the extent that these individuals, Wilson and Anderson, are named as wrongdoers as asserted in Plaintiff's FTCA claim, they acted as agents of the government. The Court notes that the only named defendant in the FTCA claim is the United States of America.

Specifically, a successful FTCA claim must be: (1) against the United States; (2) for money damages; (3) for injury or loss of property, or personal injury or death; (4) caused by the negligent or wrongful act or omission of any employee of the Government; (5) while acting within the scope of his office or employment; and (6) under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Plaintiff easily meets the first, second, third, fifth and sixth elements.  First, the Court-approved form complaint  clearly names the United States as the defendant.  ECF No. 50 at 1.  Second, Plaintiff seeks compensatory damages.  Id. at 8.  Third, Plaintiff clearly alleges he suffered personal injury in the form of an exacerbated Achilles tendon injury.  Fifth, Plaintiff clearly alleges that the agents of the government, Wilson and Anderson, were acting within the scope of their employment at the Bureau of Prisons Health Service when his injury was exacerbated by their acts or omissions.  Sixth, the United States, if a private person, would be liable to Plaintiff in accordance with the law of the place where the act or omission occurred.

As to the fourth element, Plaintiff alleges that although his injury was not ***caused*** by the negligent or wrongful act or omission of any employee of the Government, it was ***made worse*** by the negligent or wrongful act or omission of Wilson and Anderson. Plaintiff claims that "Defendants violated their duty of care" and by a delay in necessary medical care, caused him to "sustain extensive pain and suffering" and permanent mobility and gait problems.  ECF No. 50 at 6, 8.  More specifically, Plaintiff asserts that although he saw medical providers several times from the date of his injury, March 17, 2018, through September 25, 2018, during that time he was denied the necessary medical

treatment of surgical repair of his ruptured Achilles tendon.  Court's Exhibit 1 at 1.  Plaintiff contends that he repeatedly asked Wilson and Anderson about whether delays in his treatment would exacerbate his injury, which concern was confirmed when Plaintiff saw Dr. Santrock on September 25, 2018, and was told that the BOP had waited too long to bring Plaintiff back for surgery.  Id.  Plaintiff essentially claims that Wilson and Anderson were deliberately indifferent to his serious medical condition, including their failure to require their independent contractor to promptly schedule medical appointments and surgery for Plaintiff.

In order to prove the fourth prong of the Brownback test, that his injuries were caused or exacerbated by the negligent or wrongful acts or omissions of Wilson and Andrews, Plaintiff must demonstrate that he meets the two-part test articulated by the Fourth Circuit for a successful Eighth Amendment "cruel and unusual punishment" claim.

### 1.    Cruel and Unusual Punishment Claims

A prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison officials acted with a "sufficiently culpable state of mind."  Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998).  More recently, the Fourth Circuit has restated the test, finding that a litigant "must prove an objective element: a 'deprivation of a basic human need' that is 'sufficiently serious.'  And second, he must prove a subjective element: 'that the officials acted with a sufficiently culpable state of mind.'"  Moskos v. Hardee, 24 F.4th 289, 297 (4th Cir. 2022).

### a.    The Objective Element: Any Deprivation Must be Sufficiently Serious

Plaintiff contends that the rupture of his Achilles tendon is a serious medical need which merited medical treatment.  The objective element is satisfied by proof of the inmate

having a serious medical need.  Johnson, 145 F.3d at 167.  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Heyer v. United States Bureau of Prisons, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  See also Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990); Quintana v. Santa Fe Cnty. Bd. of Commissioners, 973 F.3d 1022, 1029 (10th Cir. 2020).

The Supreme Court, in a case originating in the Fourth Circuit, and several Courts of Appeal have found that a ruptured Achilles tendon is a serious medical need.  In West v. Atkins, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988), the plaintiff, a North Carolina state inmate, tore his Achilles tendon while playing volleyball in state custody. In addressing the issue of whether a contracted outside physician was a state actor for purposes of § 1983 liability, the Supreme Court found that, if the outside physician "misused his power by demonstrating deliberate indifference to West's serious medical needs [related to his Achilles tendon injury], the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish West by incarceration and to deny him a venue independent of the State to obtain needed medical care."  487 U.S. at 55, 108 S.Ct. at 2258–59.  In Petties v. Carter, 836 F.3d 722 (7th Cir. 2016), as amended (Aug. 25, 2016), the parties agreed, and the Court confirmed that a torn Achilles tendon was a serious medical injury.  The Petties court described the severity of such an injury:

> An Achilles tendon rupture is a tear in the tendon which impedes the ability of the foot to point downward, causing pain and limiting mobility. Walking around on a ruptured tendon exacerbates the injury, increasing the gap between the torn

> edges of a tendon because of the way that muscles contract
> in the foot and calf. Immobilizing the injured foot prevents
> stretching of the tear and allows the torn edges of the tendon
> to sit together, and scar tissue to form, rejoining the edges.
> When an Achilles rupture is not immobilized, the stretching
> apart of the torn tendon edges when the injured foot hits the
> ground causes severe pain and weakness.

836 F.3d at 726.  See Gaines v. Busnardo, 735 F. App'x 799, 803 (3d Cir. 2018)(Gaines

heard a pop in the back of his ankle and was offered only an ankle sleeve or ACE bandage

for a torn Achilles tendon);  Hemmings v. Gorczyk, 134 F.3d 104 (2d Cir. 1998) (after

prisoner ruptured his Achilles tendon while playing basketball, his Eighth Amendment

claim based on alleged deliberate indifference to his serious medical needs warranted

further factual development).

Here, the Plaintiff was diagnosed by two separate physicians, Drs. Snead and

Santrock, as requiring Achilles tendon repair surgery.  The first recommendation for

Achilles surgery was made by Dr. Snead on April 6, 2018.  ECF No. 55-3 at 98 – 99.  The

second recommendation for Achilles surgery was made by Dr. Santrock on May 3, 2018.

ECF No. 55-3 at 88 – 90.  As recognized by multiple courts, including the Supreme Court,

treatment for Achilles tendon rupture is a serious medical need.  Accordingly, it appears

that Plaintiff has met the first prong of the two-part test articulated in Johnson to assert a

successful Eighth Amendment cruel and unusual punishment claim.

### b. The Subjective Element: Officials Acted with a Sufficiently Culpable State of Mind

Plaintiff has further articulated that BOP officials acted with a sufficiently culpable

state of mind in denying him prompt and appropriate medical care for his rupture Achilles

tendon.

To be deliberately indifferent to a serious medical need, an official must be aware of the serious medical need.  As recognized by the Fourth Circuit, "An officer is deliberately indifferent only when he 'knows of and disregards' the risk posed by the serious medical needs of the inmate.  The subjective component therefore sets a particularly high bar to recovery."  Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Further, Iko notes that, "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."  Id. (quoting Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999)).

Plaintiff alleges that Wilson and Anderson were aware of his need for **prompt** medical treatment.  However, Plaintiff contends that despite receiving **some** medical treatment, the lack of **prompt** treatment worsened his injury.

### i.   Wilson and Anderson's Knowledge of Plaintiff's Injury and Need for Prompt Treatment

Wilson and Anderson were aware of Plaintiff's serious medical injury as early as March 19, 2018, two days after it occurred.  On March 19, 2018, Wilson co-signed Health Services medical records related to the initial x-ray of Plaintiff's ankle.  ECF No. 55-3 at 22.  On April 6, 2018, Anderson document that Plaintiff had a consultation for orthopedic surgery with a target date of April 9, 2018.  Id. at 17.

### ii.   Delay in Medical Treatment

Plaintiff claims that the delay in his medical treatment has exacerbated his injury, and caused him lifelong mobility issues.  ECF No. 50; Court's Exhibit 1.  According to Plaintiff, "Wilson and Anderson were aware that rapid surgery was needed yet opted for an easier and less efficacious treatment."  Court's Exhibit 1 at 2.  Further, Plaintiff

contends that Wilson and Anderson "recklessly disregarded the substantial risk that the delay in repairing Sims' injury would permanently harm him." Id.

Delays in medical treatment have been found to constitute denial of adequate medical care.  The Fourth Circuit recently considered a case which involved delay of medical treatment, finding that a delay of up to 120 minutes for pepper spray decontamination was not a constitutional violation.  In its opinion, the Court addressed the concept of medical delays generally:

> As the Supreme Court has made clear, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Rather, "to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Not all medical delays, of course, will meet this standard.  Medical care is often not immediate. Only the most fortunate are able to receive a doctor's appointment at the precise time they want it or medical attention at the very moment of arrival at a hospital. Waiting is often the name of the game.  And actual treatment may not follow immediately upon medical attention, whether due to the caution of a prudent physician or the inevitable uncertainties of diagnosis. It would be wrong to turn the everyday inconveniences and frictions associated with seeking medical care into constitutional violations whenever they occur within the prison walls.  Mere delay is therefore not enough.  Rather, "[t]he objective prong requires [Moskos] to show that the alleged delay ... put him at a 'substantial risk' of 'serious harm.'" A commonplace medical delay such as that experienced in everyday life will only rarely suffice to constitute an Eighth Amendment violation, absent the unusual circumstances where the delay itself places the prisoner at "substantial risk of serious harm," such as where the prisoner's condition deteriorates markedly or the ailment is of an urgent nature. Such conditions are plainly not met here. Moskos experienced the usual transitory effects of pepper spray for a period of, at most, 90 to 120 minutes. He did not testify to any serious medical reaction or to any pain beyond the normal discomfort of pepper spray: even by his own account, he simply expressed that his eyes were burning, not that he was experiencing more serious medical issues.

Moskos v. Hardee, 24 F.4th 289, 297 – 98 (4th Cir. 2022) (cleaned up).  By contrast, here Plaintiff did not experience a common place medical delay.  Instead, he waited for more than six months after his March 17, 2018, injury for a surgical procedure which was prescribed on April 6, 2018, but never provided.  During that time Plaintiff did not experience transitory effects of the failure to provide treatment.  He claims that instead he suffered permanent damage to his ability to walk.  Moreover, Anderson prepared medical notes which confirmed that Plaintiff's targeted surgery date was April 9, 2018.  ECF No. 55-3 at 17.  Nonetheless, the surgery was delayed for many months until Plaintiff's orthopedist advised him on September 25, 2018, that surgery was no longer a viable treatment option.  Id. at 70 – 73.

"Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems.  Officials may also be held liable when the delay results in a lifelong handicap or a permanent loss."  Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999) (citing Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 & n. 21 (11th Cir.1994) (collecting cases)).  See also Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988) (a serious medical need can also exist if a delay in treatment would cause a life-long handicap or permanent loss.)[14]

---

[14]  In Estelle v. Gamble, 429 U.S. 97, 104 n.10, 97 S. Ct. 285, 288, 50 L. Ed. 2d 251 (1976), the Supreme Court illustrated the types of conditions that would qualify as serious medical needs by citing examples from several circuit court decisions.  For example, loss of an ear, Williams v. Vincent, 508 F.2d 541 (2d Cir.1974), or refusal of a doctor to treat an allergic reaction after the injection of penicillin despite his knowledge that the inmate was allergic to the drug,  Thomas v. Pate, 493 F.2d 151, 158 (7th Cir.1974).  See also Neitzke v. Williams, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338, (1989) (brain tumor); Hathaway, 37 F.3d at 66 (delay in removing broken pins from hip for over two years and nearly fifty complaints of pain). Conversely, conditions that have failed to satisfy the constitutional "serious medical

The subjective element is satisfied by showing deliberate indifference by prison staff.  Johnson, 145 F.3d at 167.  The Fourth Circuit has summarized what constitutes deliberate indifference:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. Deliberate indifference may be demonstrated by either actual intent or reckless disregard. A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. Nevertheless, mere negligence or malpractice does not violate the eighth amendment.

Miltier v. Beorn, 896 F.2d 848, 851 – 52 (4th Cir. 1990) (internal citations omitted).  Here,

---

need" standard include a kidney stone, Hutchinson v. United States, 838 F.2d 390, 393–94 (9th Cir.1988), a refusal to provide "high performance" footwear to an inmate with chronic ankle arthritis, Alston v. Howard, 925 F.Supp. 1034, 1040 (S.D.N.Y.1996), a failure to prescribe orthopedic shoes and dressing feet too tightly after bunion surgery, Cole v. Scully, No. 93 Civ.2066 (LAP), 1995 WL 231250, at *6 (S.D.N.Y. Apr.18, 1995), a toothache, Tyler v. Rapone, 603 F.Supp. 268, 271–72 (E.D.Pa.1985), and a broken finger, Rodriguez v. Joyce, 693 F.Supp. 1250, 1252–53 (D.Me.1988).  As restated in Veloz v. New York, 35 F. Supp. 2d 305, 312 (S.D.N.Y. 1999).  Additional examples of what does not constitute a serious injury include: a foot condition involving a fracture fragment, bone cyst and degenerative arthritis, Veloz, supra, and a rotator cuff injury, Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997).

Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995).  In Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997), plaintiff was found to have made a prima facie case that his arthritis constituted a medical condition which required treatment, that the condition significantly affected his daily activities, and that he suffered chronic pain as a result of this condition.  A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking, and requiring surgery to correct it is a serious medical condition.  Clinkscales v. Pamlico Corr. Facility Med. Dep't, 2000 WL 1726592, at *2 (4th Cir. Nov. 21, 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 F.3d 132, 137 (2nd Cir. 2000).  An inmate's need for prescription eyeglasses constituted a serious medical condition where, as result of not having glasses, the inmate suffered headaches, his vision deteriorated, and he was impaired in daily activities.  Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998) (citing Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir.1996)).  A degenerative hip a serious condition which required surgery prior to incarceration is a serious medical condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2nd Cir. 1994).  Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008).  A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978).

Plaintiff presents facts that the medical care he was provided was so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.  Plaintiff contended, and the medical records provided by Defendant demonstrate, that Plaintiff was prescribed surgical repair on April 6, 2018.  Anderson identified April 9, 2018, as a target date for Plaintiff's surgery.  Plaintiff was again prescribed surgical repair on May 3, 2018, by a separate physician.  Despite being twice prescribed surgery to correct Plaintiff's Achilles rupture, more than five months passed without Plaintiff's surgery ever being scheduled.  Such delay, and ultimately denial of treatment, is grossly incompetent, inadequate, or excessive, and further shocks the conscience and is intolerable to fundamental fairness.  Petitioner was sentenced to a term of incarceration, not to being crippled because of his incarceration.

The undersigned recognizes that so long as the medical treatment given is adequate, the fact that an inmate would have preferred a different type of care does not constitute deliberate indifference.  Chance v. Armstrong, 143 F.3d 698, 703 (2nd Cir. 1998).  Although it is clear that Plaintiff would have preferred surgery to treat his ruptured Achilles, it is more important to the analysis that two separate orthopedic specialists, Drs. Snead and Santrock, recommended the surgical repair.  For all of the above reasons, it appears that Plaintiff has demonstrated that prison officials acted with deliberate indifference[15] to his serious medical need.

---

[15]  Other Courts of Appeal have found that deliberate indifference is evident where: (1) prison officials erect arbitrary and burdensome procedures that "result[ ] in interminable delays and outright denials of medical care to suffering inmates."  Todaro v. Ward, 565 F. Supp 48, 53 (2d Cir.1977); (2) "Prison officials . . . opt for an easier and less efficacious treatment of the inmate's condition."  Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987); (3) prison employees refused to provide prescribed medication when an inmate with known heart problems complained of chest pain.  Gaines v. United States, 498 F. App'x 415, 416 (5th Cir. 2012) (citing Easter v. Powell, 467 F.3d 459, 463–65 & n. 25 (5th Cir. 2006)); and (4) prison officials fail to provide medication to manage diabetes. Phillips v. Roane Cnty., Tenn., 534 F.3d 531, 541 (6th Cir. 2008).

To deflect liability for its failure to provide prompt medical care, the United States relies on the independent contractor exception to FTCA liability.  It argues that liability instead lies with IMS, the BOP's independent contractor in charge of scheduling medical appointments.  The United States argues that:

> Congress has made it clear that the FTCA waiver only applies to tortious acts or omissions committed by employees of the federal government, and the FTCA expressly shields the government from liability for the alleged tortious conduct of an independent contractor. See 28 U. S. C. §1346(b)(1), § 2671. The FTCA defines employees as "officers or employees of any federal agency," but it specifically excludes "any contractor with the United States." 28 U. S. C. § 2671. These statutory provisions create the "independent contractor" exception to the waiver of sovereign immunity found in the FTCA. See *United States v. Orleans*, 425 U.S. 807, 813-14 (1976); *Logue v. United States*, 412 U.S. 521, 525-26 (1973). As noted by the Fourth Circuit:

>> The FTCA, by its own terms, applies only to the acts of federal employees and explicitly excludes the possibility of federal government liability for the acts of independent contractors. Section 1346(b) covers injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment" (emphasis added), but the term, employee of the government, "does not include any contractor with the United States," see 28 U.S.C. §2671. *Berkman v. United States*, 957 F.2d 108, 111 (4th Cir. 1992).

ECF No. 55 at 9.  However, the same case cited by the United States held that the independent contractor exception did not completely absolve the United States from liability.  In Berkman, the plaintiff sued for injuries suffered following a slip and fall at Washington Dulles International Airport, which facilities were owned and operated by the

Federal Aviation Administration (FAA).   The government argued that an independent contractor responsible for cleaning and maintaining terminal facilities, including cleaning the leaking hydraulic fluid which caused Berkman's slip and fall, absolved the government of all liability.   However, the Fourth Circuit disagree and noted that:

> The fact that an independent contractor may have been responsible for Berkman's fall, however, cannot be viewed as relieving the United States from liability where the plaintiff alleges that federal employees also may have caused or contributed to the alleged tort. *See McKay v. United States,* 703 F.2d 464, 472 (10th Cir.1983) (noting that the FTCA precludes government liability for torts of an independent contractor "[a]bsent negligence on its part"). Berkman's complaint alleges that the FAA had a duty to "clean, maintain, inspect, and keep said shuttle buses and disembarkation lounges attendant thereto in good order." The complaint also alleges that the FAA "failed to use reasonable care while lubricating the doors" and failed to inspect to see that slippery substances were not left on the floor (which is apparently an allusion to the fact that it was not until after Berkman fell that the door was inspected and discovered to be leaking hydraulic fluid onto the metal plate upon which Berkman allegedly slipped). Since the contract between the FAA and Arrow General did not, by its terms, delegate these allegedly causative tasks to Arrow General, it would appear that Berkman has effectively claimed that both the government and Arrow General were responsible for his injuries. While it *may* be true that Arrow General should have removed the spill before Berkman slipped, it *may* also be true that negligent inspection and maintenance of the door, as well as the failure to close the gate to passenger use prior to Berkman's fall, constituted negligence on the FAA's part and was at least a partial cause of the accident. The issue of FAA negligence and causation stands wholly apart from that of Arrow General. *See Logue,* 412 U.S. at 532–33, 93 S.Ct. at 2221–22 (vacating judgment to determine whether negligence of government employee, as distinct from and in addition to the negligence of an independent contractor, was a cause of the injuries alleged).

957 F.2d at 114.  Further, in Williams v. U.S., 50 F.3d 299 (4th Cir. 1995), the Fourth Circuit summarized the holdings of Logue and Orleans, and found that read together

those cases, "establish the principle that the United States will not be liable under the independent contractor exception of the FTCA by virtue of entering contracts and demanding compliance with federal standards, unless the United States actually supervises the 'day-to-day operations' of the endeavor."  50 F.3d at 306.  Here, agents of the United States appear to have, by necessity, supervised the day-to-day operations of its contract with IMS, because IMS would not have made any appointments for inmates without agents of the BOP requesting the same.

The undersigned recognizes that Krembel v. United States, 837 Fed. Appx. 943 (4th Cir. 2020), held that an independent contractor, not the BOP, was responsible for scheduling Krembel's micrographic surgery for carcinoma, thereby meeting the independent contractor exception to FTCA liability.  There, the micrographic surgery was delayed for more than three months.  As a result of the delay in treatment, Krembel's cancer spread and he was no longer a candidate for the procedure.  As a result, Krembel underwent a serious of more invasive, disfiguring treatments.  Ultimately, suit was brought by the executor of Krembel's estate.  The independent contractor in Krembel, was the University of Massachusetts Medical School ("UMass").  In its decision, the Fourth Circuit had the benefit of the contractual agreement between the BOP and UMass, and the contention of the parties over whether the BOP exercised day-to-day control over the medical judgment of the UMass contractors.

The case is distinguishable.  UMass not only contracted to *schedule* medical treatment for inmates, it also *provided* that medical treatment.  Here, IMS had sole responsibility for scheduling medical treatment for inmates at the request or directive of BOP medical employees.  Any change in diagnosis, treatment, or follow up care, was

directed by BOP, to IMS for scheduling, not providing treatment.  Unlike in <u>Krembel</u>, the appointments scheduled by IMS were with outside providers.  The United States has not provided any documents related to its contractual relationship with IMS for consideration.  Moreover, in the declaration of Dr. Eddie Anderson, Anderson refers to IMS as a "contract company".  ECF No. 55-1 at 2, ¶ 8.  Some contract medical providers have been held to be government actors for purposes of denial of medical care claims. West v. Adkins, 487 U.S. 42, 55 – 56 (1988).  Anderson does not specify whether IMS is an independent contractor.  Accordingly, it appears that genuine issues of material fact remain as to the relationship between the BOP and IMS.

Plaintiff cites to <u>Knowles v. United States</u>, No. 5:12-CT-3212-F, 2015 WL 13214314 (E.D.N.C. December 14, 2015) in support of his claims.  Knowles was a federal inmate who required treated for vision issues in his right eye.  Following a procedure, Knowles was scheduled for follow up surgical treatment within two months, but nearly three months passed before the BOP returned him to his eye doctor.  Subsequently Knowles eventually lost all vision in his right eye.  The eye doctor, Dr. Jindal, testified that timely treatment could have saved some of Knowles' vision in his right eye.   The Court rejected the independent contractor exception to the FTCA, finding:

> Plaintiff has established by a preponderance of the evidence that BOP officials themselves were negligent, separate from any conduct by independent contractors. Specifically, the evidence indicates that, on July 23, 2010, Dr. Jindal scheduled a surgery for Plaintiff's right eye within two months. Plaintiff's primary care provider, Butner's clinical director, and the [BOP] U[tilization] R[eview] C[ommittee]—all BOP employees—were aware of, and approved, this scheduled surgery. Despite this knowledge and approval, Plaintiff was not transported by the BOP to this surgery in a timely manner. After reviewing the entire record the court finds that Plaintiff has established by a preponderance of the evidence that

40

> Defendant had a duty to transport him to a surgery that it had
> previously approved in a timely manner, and Defendant
> breached this duty.

2015 WL 13214314, at *5.  The undersigned recognizes the similarities between Knowles and the Plaintiff, both of whom were denied timely medical care.  In <u>Knowles</u>, an appointment was scheduled but the BOP failed to transport Knowles, whereas in Plaintiff's case the BOP failed to ensure that their contractor scheduled the appointment.  Accordingly, the undersigned recommends that the Court reject the independent contractor exception in Plaintiff's case, pending further proceedings.

In conclusion, Plaintiff's assertions appear to allege sufficient facts for a successful claim under the FTCA, pursuant to the six-part statutory test contained in 28 U.S.C. § 1346(b).  First, Plaintiff alleges his claim against the United States.  Second, Plaintiff seeks an unspecified amount of money damages.  Third, Plaintiff alleges that he suffered personal injury, specifically a ruptured Achilles tendon which based on failure to surgically repair the torn tendon, has caused him difficulty walking.  Fourth, Plaintiff alleges his injuries were caused by the negligent or wrongful act or omission of Wilson and Anderson, both employees of the Government.  Fifth, Plaintiff alleges that Wilson and Anderson were acting within the scope of their office or employment when they were deliberately indifferent to his serious medical needs, which indifference caused or exacerbated his injuries. Sixth, Plaintiff claims that those injuries were caused under circumstances where the United States, if a private person, would be liable to him in accordance with the law of West Virginia, where the act or omission occurred.  Plaintiff appears to have demonstrated that he meets all six prongs to assert a cause of action under the FTCA.  Although Defendant may be immune from suit under the Federal Tort Claims Act based

on the independent contractor exception, this case should proceed for further disposition.

The Court recognizes that the Bureau of Prisons is not only responsible for housing individuals convicted of federal crimes, but also to provide those individuals with prompt and appropriate medical care.  Denial of prescribed surgical care, that results in inmates being permanently maimed or crippled, constitutes a clear denial of appropriate medical care.  Accordingly, there appear to genuine issues of material fact, Plaintiff appears to state a claim upon which relief may be granted, and this claim should proceed for further consideration.

To the extent that Plaintiff advances a medical negligence claim, such claims raised in FTCA proceedings are governed by the law of the state where the tort is alleged to have been committed.  Because Plaintiff asserts that he was injured in West Virginia, West Virginia State law governs his claim.  The applicable statute provides:

> (a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:
>
> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
>
> (2) Such failure was a proximate cause of the injury or death.

W. Va. Code Ann. § 55-7B-3.

Plaintiff claims he did not receive timely or appropriate care for his Achilles rupture. Under W.Va. Code § 55-7B-3, to merit relief for such a claim, Plaintiff must demonstrate that "[t]he health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or

class to which the health care provider belongs acting in the same or similar circumstances." Plaintiff appears to make a prima facie demonstration of such a failure of care by agents of the Government. Plaintiff was twice evaluated by orthopedic specialists who recommended surgical repair of his ruptured Achilles tendon, starting on April 6, 2018, with further evaluation on May 3, 2018. ECF No. 55-3 at 17, 88 – 93. An MRI ordered on May 3, 2018, was not conducted until June 26, 2018, after which a radiologist confirmed Plaintiff suffered a partially ruptured Achilles tendon. Id. at 89 – 93, 82. Finally, on September 25, 2018, Plaintiff was again seen by an orthopedic specialist who advised that the delay in care meant that Plaintiff was no longer a candidate for surgical repair. Id. at 70 – 73. Instead, the treating orthopedist recommended intensive physical therapy which would possibly resolve the Achilles injury over a period of months to years. Id.

The records show that Plaintiff first reported his injury on the date it was incurred, March 17, 2018. More than six months later, the BOP and its agents had not managed to provide the medical treatment recommended by multiple treating physicians. Further, throughout that time period, Plaintiff repeatedly inquired in writing including on April 22, 2018, June 20, 2018, and July 20, 2018, about when he would receive the prescribed surgical treatment. ECF No. 55-3 at 97; 81; 79. Moreover, on at least one occasion, August 20, 2018, Plaintiff was transported for an appointment which IMS scheduled with the wrong doctor, resulting in Plaintiff not receiving any treatment on that date. ECF No. 55-3 at 13. Plaintiff contends and the medical records demonstrate that Wilson and Anderson, both agents of the United States, were aware of the multiple delays in medical treatment for Plaintiff.

43

For all of the above reasons, the Court finds that Plaintiff has demonstrated that BOP health care providers "failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider".  Accordingly, the undersigned finds that Plaintiff states a prima facie claim upon which relief may be granted as to his FTCA claim for medical negligence, and recommends that the claim proceed before the District Court.

For all of these reasons, the undersigned recommends that the District Court permit Plaintiff's FTCA claims to proceed.

### D.      Plaintiff's Bivens Claims

Plaintiff was notified by the Court on November 8, 2021, of the consequences of pursuing both a Federal Tort Claim Act and a Bivens action.  ECF No. 25.  Therein, the Court advised Plaintiff "that a judgment under the FTCA constitutes 'a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim.'  28 C.F.R. § 2676."   Id. at 1.  The Court explicitly advised Plaintiff that if he "elects to pursue his remedy under the FTCA to judgment, he risks dismissal of his Bivens claim because the Bivens claim arises from 'the same subject matter and is against the same employees whose act or omission gave rise to the claim.' "   Id.  Plaintiff elected to pursue both claims.  ECF No. 31.  The recommendation that Plaintiff's FTCA claim should proceed means that Plaintiff's Bivens claim could also proceed.  However, the Court finds that Plaintiff's Bivens claim is meritless based on his failure to exhaust his administrative remedies prior to filing his Bivens complaint.

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with

respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies.  42 U.S.C. § 1997e(a).  "Federal prisoners must exhaust their administrative remedies prior to filing § 2241 petitions.   Failure to exhaust may only be excused upon a showing of cause and prejudice."   McClung v. Shearin, 90 F. App'x 444, 445 (4th Cir. 2004) (citing Carmona v. United States Bureau of Prisons, 243 F.3d 629, 634-35 (2d Cir.2001), Little v. Hopkins, 638 F.2d 953, 953-54 (6th Cir.1981)).  Exhaustion as provided in § 1997e(a) is mandatory, regardless of the relief offered through administrative procedures.  Booth v. Churner, 532 U.S. 731, 741 (2001).  Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court.   Porter v. Nussle, 534 U.S. 516, 524 (2002) (citing Booth, 532 U.S. at 741).   "Those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'"   Porter, 534 U.S. at 524.

Although generally, the exhaustion of administrative remedies should be raised by the defendant as an affirmative defense, if the failure to exhaust is apparent from the face of the complaint, the court has the authority under 28 U.S.C. § 1915 to dismiss the case sua sponte.  Custis v. Davis, 851 F.3d 358, 361 (2017) ("A court may sua sponte dismiss a complaint when the alleged facts in the complaint, taken as true, prove that the inmate failed to exhaust his administrative remedies.")

In his Bivens complaint, Plaintiff admits he knew there was a grievance procedure at USP Gilmer, and contends that he exhausted his administrative remedies.  ECF No. 51 at 4.  Plaintiff asserts that he filed grievances on the Bureau of Prisons "BP-8/9", BP-10, and BP-11 forms, but that all were denied.  Id. at 5.  Defendant Wilson argues that not only did Plaintiff fail to exhaust his administrative remedies, but that his assertion of

exhaustion is "a false statement".  ECF No. 56 at 11.

Plaintiff filed his complaint on the Court-approved form for a Bivens action in this district, which includes six pages of instructions.  https://www.wvnd.uscourts.gov/forms, Pro Se Forms, Bivens Action.  On page 1 the instructions provide, "You may not bring an action challenging prison conditions **UNTIL YOU HAVE EXHAUSTED ALL AVAILABLE ADMINISTRATIVE REMEDIES**, including any grievance system.  See 42 U.S.C. § 1997e(a)." Id. (emphasis in original).  Although Plaintiff was able to exhaust his remedies for his FTCA claim, however, it is clear that he failed to do so for his claims asserted pursuant to Bivens.

Filed with Defendants' motion to dismiss or for summary judgment, were exhibits related to Plaintiff's administrative remedies, which show that Plaintiff did not exhaust his remedy at the Central Office as relates to the claims contained in his Bivens complaint.  ECF Nos. 56-1, 56-3.  One of those exhibits is the declaration of Destiny Spearen, a paralegal at the Consolidated Legal Center for the Federal Bureau of Prisons.  ECF No. 56-1 at 2.  Ms. Spearen states that [d]uring the time Plaintiff has been designated to FCI Gilmer, he has filed or attempted to file three administrative remedies."  Id. at 3.  Ms. Spearen's declaration further summarizes Plaintiff's administrative remedies filings:

> (1)     Administrative remedy 992665-F1, a BP-9 was filed on October 2, 2019, at the institutional level, and related to Plaintiff's treatment for his ankle injury.  A response was provided on October 21, 2019.  ECF No. 56-1 at 3.

> (2)     Administrative remedy 995945-R1, was filed with the regional office, but bypassed the required institutional submission.  Id.  This was not an appeal of 992665-F1, but was a different remedy, related to "other operations", not his ankle injury.  Id. at 3 – 4.  This remedy was denied by the regional office.  Id. at 4.

46

> (3)   Administrative remedy 995945-A1, was filed directly with the "Central Office on December 9, 2019, without first filing at the institutional and regional levels." Id.  This remedy was rejected on December 13, 2019.  Id.

Attached to Ms. Spearen's declaration is the Administrative Remedy Generalize Retrieval form showing each of Plaintiff's administrative remedies which correspond to those described in the declaration itself.  ECF No. 56-3 at 1 – 4.  None of the three administrative remedies was properly filed at the institutional level, followed by an appeal to the regional level, followed by a second appeal to the Central Office.  Id.  Although Plaintiff exhausted his administrative remedies as to his FTCA claim, as evidenced by the July 13, 2020, letter from the Beckley Consolidated Legal Center [ECF No. 55-6 at 2], he did not exhaust his administrative remedies as to his Bivens claims.

In Jones v. Bock, 549 U.S. 199, 216 (2007), the United States Supreme Court concluded that "failure to exhaust is an affirmative defense under the PLRA."  Although the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise," the Court held "that Congress has provided in 1997e(a) that an inmate must exhaust [his claims] irrespective of the forms of relief sought and offered through administrative avenues." Booth, 532 U.S. at 741, n.6. Several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. See Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense when defendant's actions render grievance procedure unavailable); Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (summary dismissal for failure to exhaust is not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001)

(remedy not available within meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); <u>Aceves v. Swanson</u>, 75 F. App'x. 295, 296 (5th Cir. 2003) ("If the institutional authorities refuse to provide a prisoner with the forms needed to exhaust administrative remedies, then those remedies are not 'available' to the prisoner.")   Consistent with other Circuits, the Fourth Circuit has held that "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." <u>Moore v. Bennette</u>, 517 F.3d 717, 725 (4th Cir. 2008) (citing <u>Aquilar-Avellaveda v. Terrell</u>, 478 F.3d 1223, 1225 (10th Cir. 2007); <u>Kaba v. Stepp</u>, 458 F.3d 678, 684 (7th Cir. 2006)).   Here, Plaintiff filed administrative remedies but failed to properly exhaust those claims.   Because exhaustion has not occurred, this court is without jurisdiction to consider Plaintiff's claims asserted under <u>Bivens</u>.

In <u>Steel Co. v. Citizens for a Better Environment</u>, 523 U.S. 83, 94 - 95 (1998), the Supreme Court wrote that "without jurisdiction the court cannot proceed at all in any cause.   Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." <u>See also</u> <u>Reinbold v. Evers</u>, 187 F.3d 348, 359 n. 10 (4th Cir. 1999).   Because this court lacks jurisdiction, this court cannot entertain Plaintiff's <u>Bivens</u> complaint.

### E.    Plaintiff's Complaint against IMS

Plaintiff's complaint against IMS was filed in this consolidated action on May 4, 2022.   ECF No. 52.   A sealed 60-day summons issued on June 7, 2022.   ECF No. 59. The West Virginia Secretary of State, acting as attorney-in-fact, accepted service on behalf of IMS on July 8, 2022, and returned the summons as executed on July 18, 2022.

ECF Nos. 68, 78.  Mail addressed to IMS at the address 101 Medical Court, Martinsburg, WV 25401, was returned as "not deliverable as addressed / unable to forward" on August 1, 2022.  ECF No. 70.  On October 24, 2022, Plaintiff filed a letter motion to confirm that service was effected properly on IMS.  ECF No. 83.  That motion remains pending.

## V.    RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Plaintiff's complaint against the United States of America [ECF No. 50] proceed before the District Court.  It is further **RECOMMENDED** that Plaintiff's <u>Bivens</u> complaint [ECF No. 51] be **DISMISSED WITHOUT PREJUDICE**  based on his failure to exhaust his administrative remedies.

It is further **RECOMMENDED** that Plaintiff's motion [ECF No. 83], regarding service of process on IMS be terminated as **MOOT**, and that Plaintiff's complaint [ECF No. 52] against Integrated Medical Systems (IMS) be permitted to proceed for further disposition.

It is further **RECOMMENDED** that the amended motion to dismiss filed by the United States of America and A. Wilson [ECF No. 60] be **GRANTED in part**, and that Plaintiff's claims as to the United States of America should proceed, but his claims against A. Wilson should be dismissed.  Additionally, it is **RECOMMENDED** that the motion to dismiss [ECF No. 71] filed by Eddie Anderson be **GRANTED**.

**Within fourteen (14) days** after being served with a copy of this Recommendation, any party may file with the Clerk of the Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge.

Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.**  Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the Magistrate Judge's association with this case.

The Clerk is directed to provide a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet, and to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED:        November 21, 2022

/s/ *Robert W. Trumble*
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE